May it please the Court, Anne McClintock of the Federal Defender's Office on behalf of Mr. Anderson. There are three interrelated problems that were part of the single certificate of appealability that was granted by this Court, and that was whether the trial court violated Mr. Anderson's due process rights by failing to hold a competency hearing, by allowing him to remain shackled, visibly shackled, during the jury trial, and in failing to revoke his pro se status. And until you start asking me questions, I'm going to focus on the competency and the shackling issues. I did file a 28-J letter regarding Ybarra, and that really has to do with kind of the core of the problem with the competency issue, is that, and the facts are undisputed by the government in their answering briefs, since they didn't address what happened during the trial proceedings, is there's a, in early October, I think it's the 18th, Mr. Saria, who's the attorney for Mr. Anderson, raises some concerns. He doesn't say that his client is not competent, but he raises concerns because his client is voicing suicidal threats, and his general behavior and his anxiety issues, and he's been diagnosed. When did that help me? Because there were two trials here. Well, there actually wasn't a first trial. The chronology, let me find my notes on the chronology. It was set to go to trial in early October. I believe, I'm not finding, I wrote them all out. Here we go. Well, there were two trials. There were two. It was about to go to trial. So on October. Two episodes before the judge. Right. And so in front of Judge Ballaton, on October 18th of 2007, the attorney expressed his doubt as to competency. He asked for continuance, and he specifically said, I have a doctor who can do something very quickly. That's the doctor heard. There actually is a hearing under seal that discusses that. And then Judge Ballaton denies the request for continuance because he wants to at least do some pre-voir dire things. And at that point, he expresses his own, which is why I think the Ybarra case is relevant, his own inexpert opinion that what Mr. Anderson is suffering from is just normal pre-jury trial stress the defendants go under. And I think that's a fundamental problem with, yes, that might be a component of it, that he's additionally stressed because he's about to face trial. As trial attorneys, we experience, judges, you see it. But this is a unique individual who has pre-existing depression and anxiety disorder, who has been treated repeatedly by the jail psych services, I don't know to what degree because we have no record of it. And there's a failure on the judge to recognize the need to make that inquiry further. Then the case gets, two days later, Mr. Anderson tries to kill himself in the jail, is found unconscious. The 22nd of October, we have a status with Judge Ballaton where he reports what had happened. The 24th, they have a further status where all that is said is that Mr. Anderson is still not available, he's in isolation, he's still under some kind of evaluation at the jail. The 25th, Mr. Anderson is in court. And at this point, he specifically says, I don't understand. I don't understand what's going on. I feel like I'm going to lose it. And yet, all that happens is, and again, this is where, I'm sorry, where Saria asked for the, more time for the doctor, her, to be evaluated. And then the case gets continued to November, and then the record in the clerk's transcripts just gives us a series of continuances. It's not even, there's no reporter's transcripts repaired. And in California, for appeal, the court reporters prepare the record. So everything gets transcribed. And, you know, the voir dire doesn't automatically, but it was requested in this case. But the attorney doesn't have to specifically ask like we do in Federal proceedings. So the inference I have is that the continuances that happen through November and December that are reported in the clerk's transcript are just stipulated continuances where there is nothing new to be able to tell about Mr. Anderson's behavior or functioning at that point. Then we end up in February, February 4th, I believe, with Judge Orr. And there's a conference in chambers. And this is at Excerpts of Record 295. There's no transcript, which makes me think it's purely a chambers proceeding. And then the first day where Mr. Anderson's back with Judge Orr is on the 5th, where he immediately asks for a Marsden hearing, which is denied, and then immediately goes to a Freda hearing, which is ultimately, initially denied and then granted. So that's the chronology that we have. So in the next day we have voir dire. So the government's position is that there's no clearly established Supreme Court precedent on any of the issues. And that's clearly not accurate. I think that Pate, from the Supreme Court in 1966, is a pretty clear indication that on this record, the combination of Mr. Anderson's behavior in court plus his suicide attempt are more than sufficient to raise a reasonable doubt, a bona fide concern about his competency. Not, as the Judge Ballinon focused on, just his ability to understand that he's in a criminal trial and he's charged with a specific kind of crime. But the second component, that is that he has the ability to assist in his own defense. Kennedy. Which judge do you believe violated Mr. Anderson's rights for a competency hearing? Do you think it was Judge Ballinon or Judge Orr? I think both of them did. I think there was sufficient consent. Can we assume that Judge Orr knew about all of the bizarre behavior that occurred before Judge Ballinon? I think as a legal matter, we assume that. How? How so? Because he's got the record before him. It's incumbent on a judge when he's taking over the case to review the case, review the case record. So was the suicide in the record before Judge Ballinon? I believe it's mentioned in the clerk's minutes. Even if the transcript hadn't been prepared, and I don't know when . . . Transcripts get prepared for the court's purposes without any record indication on counsel's . . . that would be familiar to counsel. So as a factual matter, I do not know whether Judge Orr had transcripts and reviewed the whole thing. He certainly had the court file and the minute orders, which indicate that Anderson was not available for a court because of the suicide attempt. Well, would those orders also have reflected that he showed up in court one day with his jail garb on and that he said he wanted to be shackled and that he made several other outbursts? Were all those things in transcripts that Judge Orr would have had before him? The jail clothing, I believe, is in there because it's a refusal to dress out. And I don't know, but it would be in the excerpts of record in Volume 3. You have so little time, don't worry about that. I don't know precisely, but I think from a legal review perspective that we have to assume that all the judges know what happened, whether we're going to impute to Judge Orr the knowledge that happened before. And even if he didn't, he immediately goes from what is . . . from the Freddie hearing that he initially denies, because obviously he's got some concern about this person's ability to function in court, to the voir dire the next day on the 6th where . . . interest in and maybe even a need for a hearing, a competency hearing. The judge, Judge Bellinon, said he's going to have a competency evaluation, not a hearing, but a psychiatric exam, and his own lawyer. But I find then it becomes a black hole after that. Nobody seems to . . . there's no record of whether such a hearing was held. And so I'm troubled when it gets to Judge Orr, what obligation does he have for the record to establish the answers to that black hole? The California Court of Appeals makes some assumptions, but on this record some of those assumptions are simply just speculative. And some are just flatly not accurate, I think. I think at a minimum, given the history, Judge Orr has to ask that question. Before he starts the Marsden hearing or before he goes to the . . . he needs to ask, before we relieve counsel, what's the status of Dr. Hurd and the psych assessment? That's all he needed to do. And it could have been at that point that a record would have established that would have undercut the claims that are before the court as far as competency. I've got a minute left, and I just want to touch on Shackley. I'm sorry. Judge Gould, I want to interject a question. Please. And I'll ask Judge Schroeder, please give me an extra minute or two on rebuttal. Thank you. My question is this. At some point here, I understood after the suicide attempt, there was a defense counsel who said that he was going to have a professional examine the accused for competency. Correct. And then after that, it doesn't show that that was ever done. It doesn't show that counsel ever made a motion about competency. And I thought the magistrate judge at least felt there should be an inference that the counsel probably had an exam done that indicated he was competent. That's why they didn't bring it forward. To the extent that the magistrate did, I agree with you that that's what the magistrate, that was his interpretation of what happened. That specific component of the findings and recommendations were rejected by the district court judge because she specifically rejected relying on that  And so I don't think that we can rely on that component. I think there's still a problem in the findings and recommendations of the analysis that I discussed in the briefing. So that statement was rejected on an evidentiary basis? I would think so. I'm not sure if it was a 2254-E kind of concern. I don't know what motivated it. Because you are adding to the record that wasn't before the state court. I would also add, as we pointed out in the reply, that Mr. Anderson specifically objected factually to the assumption that Dr. Hurd ever saw him or that any psych assessment happened. So there's a problem. He said he was never examined. Right. So we've just done, before you get to the Antiterrorism Act part, just from a review of the findings and recommendations on the Federal level, we have a problem with a factual dispute. And do we have any determination of credibility? Does any judge say, okay, Anderson says he was never examined. Some other people suggest he might have been. And I've got to make a ruling on that factual dispute. No. No one ruled on that. Okay. I know I'm a minute over, a minute and a half over. Just on the shackling component quickly, there's clear law in the government essentially saying there isn't and also that it's harmless. And I just want to point out, all the harmless error, because this is almost a structural defect. But the key is, did the jury see it? And we've got the jury instruction that tells us the jury saw it, independent of Judge Balinon's statement back in October, that the jury is going to know that you're shackled. And that goes to the nature of the shackling chair that's used in Sacramento County. And with that, if there are no other questions, I will sit. Thank you. Thank you. We'll give you a minute on rebuttal if you want. Good morning, Your Honors. David Andrew Eldridge, Deputy Attorney General for Respondent. If I could address the shackling issue first, because the judge did not make a finding that the jury in the future was going to see it. What happened was there were three types of shackles. There was hands, chain, and feet. The court on October 18, when Petitioner showed up, fully shackled. The court noted that, and he wanted to keep them. The court had suspicions that he was trying to influence what were then a panel of prospective jurors, and the court took off the ones at his feet. So he's still got the belly chain, and he's got the ones on his arms. What happens is, after the prospective jury goes away, they have to make a note on the record that the defendant has made, he wanted to free up his right hand, he showed it to the jurors. And the court says, the court didn't say anything about the future, but the court said, the jury knows you're in custody, and you decided you wanted to be shackled. So they have seen that too, I'm assuming, unless they're completely blind. So there's nothing about what would happen in the future. There's nothing saying that these were inherently visible. Rather, during this proceeding, the defendant did something that made the jury see it. What was on his hands. Can we just make a judicial inference? Go through a trial with a guy with sets of shackles sitting there. We all have had jury trials that you see. I mean, isn't that within the range of what a court can just use common sense on? But the question isn't what you infer, Your Honor. The question is whether the California Court of Appeal had to infer it a particular way. Or if they inferred to the contrary, whether it was factually unreasonable. Well, they did not infer to the contrary. They didn't make that decision. They said the record doesn't show that it was visible. He raised the claim on appeal. If he wanted to make a record based on something outside the record, he had the option of going on habeas. He didn't. He raised it on appeal, so he stuck with the record on appeal. The record on appeal shows that the wrist thing that was visible before, he wasn't wearing at trial. So he couldn't, that whatever may have been visible, whether you think because he showed it or not, he wasn't even wearing that at trial. All he had at trial was a belly chain, I mean a chair chain. So there's nothing to indicate that was ever seen. Well, the evidence was that the jury knew about it because the judge instructed the jury about it, and at one point he, in front of the jury, said that he needed something adjusted. So there's no doubt that the jury knew about it. But there's a difference between the court ordering visible shackles and the court ordering shackles that aren't visible and the defendant choosing to tell the jury about them. One can't claim I was forced to sit through a trial. Did you argue invited error on this point? To you? In the briefing to us. No. I didn't think so, and that's what you're trying to argue now. So I don't think that issue is before us. You are incorrect in that I am not arguing invited error.  Your Honor. There is no Supreme Court precedent on what happens when a court has not ordered visible shackles, because that is what DEC v. Missouri covers, visible shackles. They weren't visible. There was no record showing that they were visible, and he raised his claim on appeal, and he didn't make his showing on appeal that they were visible. He then made the jury aware of them. Actually, still no showing that they were visible, but he keeps referring to them on the record. The idea that the instruction, an instruction telling the juror to disregard them means they saw them is incorrect. Yes, they became aware of them, because he made them aware of them. All right. I think that we'd like to hear the other issue. Sure. As to the issue of competence, a lot has been made about why the defendant, for example, didn't participate in voir dire. Well, there's no inference required, because he said so. He said he didn't want to participate because he doesn't know how. He said he didn't cross-examine some of the witnesses because he didn't know how. At Excerpt of Record 416, he says flat out that I don't know how to pick a jury, so I'd rather not participate. So there's no indication. It goes more than that. At one point for a critical jury on voir dire, he wasn't even responsive to questions by the judge. He just sat there, kind of catatonic. So he's not what you say catatonic. He didn't respond at all to a judge's inquiry. He just sat there. Therefore, I'm not sure what a California court of appeal is required to infer from that, Your Honor. Well, I think you could make an inference that, well. Again, the question isn't what you might infer. It is rather what the California court of appeal was required to infer. Keeping in mind that neither you nor I was there and the judge who was there didn't find any reason to question competence. Again, this is a cold appellate record. You've got the snippets that, you know, the parties focus on. But you're not there. You're not seeing the court interact with him, which, by the way, someone who's talking about how he has consulted with his attorney who knows fully what's going on because he keeps talking about his priors and the 176 and the witnesses he wants to bring. And he doesn't want this particular attorney. Given the test, which is a rational understanding of the proceedings and ability to consult with counsel, there is no plausible way that he was incompetent. He understood the proceedings. He was deathly afraid and bothered because under those proceedings his conviction was almost certainly assured and he was going to face life effectively without parole in prison. It's impossible to say that there was any basis to conclude he didn't rationally understand. He was able to consult with counsel. He did so both before and after he went for RETA. And he remarked on the record, for example, that he'd had discussions with counsel about the priors. And in fact, his declaration before this Court points out his own personal memory of what he was saying to varied counsels and he thinks that he got bad advice from them. So given the test, which isn't some general idea of is he depressed, is he sad, is he emotionally bothered by it? You're arguing as if we have to decide whether he was competent or not. And that — I don't think that's the issue. Isn't the issue whether the State court should have ordered a competency evaluation, which they never did. And there is a good deal of evidence in this record of irrational and bizarre behavior and the suicide attempt. I would say the evidence is conclusively to the contrary in light of his demonstrated understanding of the proceedings, Your Honor, in light of his demonstrated ability to speak with — to address with — talk to counsel. So the idea that if one considers in isolation some things, they are consistent with the possibility he didn't understand is not the test. Certainly there's no Supreme Court case that says so. The State court of appeal didn't make a finding on that, did it? Did they make a finding whether he was competent? Did it make a finding that the record conclusively showed that he was competent? They found — rather than — they found that the record did not show substantial evidence of incompetence considering the record as a whole. So, counsel, on the case the way the court of — the State appellate court should have seen it, should there have been a good-faith doubt under Pate? I think that's where those words come from about the competency of the accused. My answer to that is no, there is no good-faith doubt. But I also challenge the idea that Pate did set the standard because the Supreme Court in drope said it didn't. It said Pate does not hold that. There is language in Pate, I know, which is suggestive, although the Supreme Court more than once has said while we recognize language in our prior cases may indicate X, they then explain that it doesn't. That's what they did in drope. They said whatever people are thinking, Pate said, it doesn't hold that. It doesn't set forth the minimum standard. And then in — they said Pate's just one example of a situation where adherence to the State court — what the State court procedure was would have led to a hearing. In drope v. Missouri, there was yet another. And in Maggio v. Fulford, which there's no response to apparently, they had a hearing based on things that were not present, even though there was a doctor's note at the very beginning. And the judge, making his own finding, looking at the whole record, including simply the defendant's credibility, said, no, he's competent. And they said, well, that's constitutionally fine as well. So the idea that there's — they've clearly established, no, you just have to stop and follow some hearing procedure once some particular quantum of evidence shows up just isn't true. If so, Maggio v. Fulford could not have come down the way it did. Let me ask you a related question, if I could. On this issue that's at play, Pate and drope, whether they should convene a hearing, what significance is there to the way the State court trial judge or judges assessed the issue at the time in their statements that I've seen on the record? I don't know if it's from both or just one of the judges. If Judge Orr and the other judge both said this. But saying that they feel he can understand the proceedings. Well, I think they are extremely important, given that those judges are there looking at the defendant. They can determine whether or not when he says, I don't understand, he's lying or he's being truthful. And at one point, I believe the court even notes, Mr. Anderson keeps saying he doesn't understand. And while the transcript doesn't allow us to decide precisely whether he's saying that sarcastically or truthfully, this claim, again, was raised on appeal. And if they want to argue that it must have been that he was crediting it, which doesn't appear from the context, they had to bring this in a way that they could. You can't tell that from the appellate record. The presumption is the judges know what they're doing. And these judges never called for a hearing. So the presumption is everything they saw, including consistent with their actual statements that he understands the proceeding, were that they saw what really is the inevitable conclusion, that he understands what's going on. He couldn't have made the arguments he did if he didn't understand. He couldn't have complained about the sentence he was going to get if he didn't understand. He couldn't have claimed that you can just do whatever you want here and the appellate court is just going to reverse this. No one who lacks a rational understanding of the proceedings can make those arguments. Are there further questions? Thank you, Your Honor. Thank you. Thank you, Your Honors, for the extra time. I don't have a whole lot to say. Reliance on his 2018 pro se brief is not meaningful to what his competency level or his functioning was in 2007, 2008. It's certainly not meaningful in a way that we can just assume that he was functioning. He's been in prison. I assume he's getting mental health care, that he's in a structured environment. He's probably on meds. I don't know, because this is an issue we've come up with. The whole notion of him trying to influence the jury by being shanty was absurd. A lot of the government's argument shows the same kind of misunderstanding about mental health issues that I don't know if that reflects the dismissiveness or the failure to have a hearing, but certainly it's consistent with Judge Balinon's assumption that the client was just stressed. I don't think that's fair given the record that we have. It seems to me, unless there are other questions that you understand. Do you have a case involving a defendant who is behaving irrationally and there is no finding on the record one way or another in the appeal as to the right to a hearing? The only one that comes immediately to mind, and I don't have a citation, is one that I dealt with before the Anti-Terrorism Act exists, Miles v. Prunky, which this Court resolved and ultimately decided to send it back for a retroactive competency hearing. This Court has done that. I assume, but I don't have a citation. I can do a 28-J letter afterwards if there's a post-AEDPA situation where you've done that. I think in this context, because of the failure of the factual dispute, that we probably don't even have to get there. I think a remand at the district court level is required anyway. All right. Thank you. Thank you. The case just argued is submitted for decision. The next case, Marquez v. McDaniel and the Attorney General, is submitted on the briefs and it is so ordered. We'll have the next case for argument, which is Henry v. Spearman.
judges: Ebel, Schroeder, Gould